**BLOOMFIELD LAW GROUP, INC.**
**A Professional Corporation**
Neil Jon Bloomfield, Esq. (State Bar No. 052235)
901 E Street., Suite 100
San Rafael, CA  94901
Telephone: (415) 454-2294
Facsimile: (415) 457-5348

Attorney for Plaintiff Nader Shaterian

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NADER SHATERIAN,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION;  CAL-WESTERN RECONVEYANCE CORPORATION; and DOES 1-50, Inclusive<br><br>　　　　　　Defendants. | CASE NO.  C 11-00920 SC<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION TO RESTRAIN TRUSTEE'S SALE OF PLAINTIFF'S RESIDENCE SET FOR MAY 20, 2011**<br><br>Date:  May 13, 2011<br>Time:  10:00 a.m.<br>**Courtroom 1** |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

　　Please take notice that on May 13, 2011 at 10:00 a.m., or as soon thereafter as counsel may be heard, Plaintiff Nader Shaterian will move this Court, at the United States Courthouse, located at 450 Golden Gate Avenue, San Francisco, 17th Floor, Courtroom 1, for an order enjoining Defendants from proceeding with the foreclosure sale of Plaintiff's residence, located at 511 Browning Court, Mill Valley, California, until the conclusion of trial on the merits or other disposition of this proceeding.  The Trustee's Sale of the residence is presently set for May 20, 2011.

　　Plaintiff seeks a preliminary injunction pursuant to Federal Rules of Civil Procedure, Rule 65, enjoining Defendants Cal-Western Reconveyance Corporation (hereafter, "Cal-Western") and Wells

Fargo National Bank (hereafter, "Wells Fargo") from foreclosing on Plaintiff's residence. Grounds for this motion include 1) The Notice of Default is invalid since Defendants did not comply with California Civil Code section 2923.5, requiring a representative to discuss options to foreclosure and Plaintiff's financial options before filing the Notice of Default, and 2) The Notice of Default was issued by an entity that did not have authority to issue it. Plaintiff will suffer great and irreparable injury if the foreclosure sale is not enjoined and the status quo is not preserved until this action can be adjudicated.

This motion is based on this Notice of Motion and Motion, the accompanying "Declaration of Neil Jon Bloomfield in Support of Motion for Preliminary Injunction" and exhibits thereto and the pleadings and papers on file in this action.

Unless otherwise noted, Exhibit references herein are to the "Declaration of Neil Jon Bloomfield in Support of Motion for Preliminary Injunction" filed herewith.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Statement of Issue to Be Decided

Should the Court issue a preliminary injunction to enjoin the May 20, 2011 Trustee's Sale of Plaintiff's residence and maintain the status quo until the conclusion of this case?

### Statement of Relevant Facts

Plaintiff is a first-time homeowner. He purchased his residence located at 511 Browning Court, Mill Valley, California, in 2003. Plaintiff learned that his home was slowly sliding down the hill upon which it was built and sought refinancing to help pay for a retaining wall. The property was refinanced in 2007, with a Deed of Trust recorded on September 13, 2007. In this Deed of Trust, Plaintiff was the trustor, "Golden West Savings Association Service Co., a California Corporation" was the trustee, and "World Saving Bank, FSB, its Successors and/or Assignees" was the beneficiary. There were numerous problems with the loan transaction, including intentional and/or negligent misstatements of facts and failure to provide proper disclosures. But for purposes of this motion for preliminary injunction, Plaintiff will focus on later transactions.

On October 7, 2010, Cal-Western recorded a Notice of Default. This Notice of Default was signed by "Marco Marquez, LSI Title Company, as Agent." There is no indication as to the role of LSI Title Company, or for whom it was acting as agent. Within the body of this Notice of Default was the following language: "Cal-Western Reconveyance Corporation is either the original trustee,

the duly appointed trustee, or acting as agent for the trustee or beneficiary under a deed of trust dated August 27, 2007 . . ."  Attached to this Notice of Default was a one-page "Declaration of Wells Fargo Bank, N.A." signed by Sandra Garza, Vice President Loan Documentation.  This declaration is apparently a standard form with blanks for name, date, and signature, as well as two separate statements.  An "x" was put in the parentheses ["(X)"] next to the statement "Wells Fargo Bank, N.A., has contacted the borrower as set forth in California Civil Code section 2923.5(a)(2)."  Although Wells Fargo allowed Plaintiff to apply for a loan modification, it had no intention of approving any modification, and did not adequately discuss with Plaintiff any alternatives to foreclosure, as required by the statute.

On December 7, 2010, two months after the Notice of Default had been recorded, Cal-Western recorded a Substitution of Trustee, in which Wells Fargo substituted Cal-Western Reconveyance Corp. for Golden West Savings Association.  Thus, at the time the Notice of Default was recorded, Cal-Western had no authority to act.   On January 12, 2011, Cal-Western recorded a Notice of Trustee's Sale, setting the sales date for February 1, 2011.

On January 28, 2011, Plaintiff filed a Complaint in the Superior Court of California for the County of Marin.  A First Amended Complaint was filed on January 31, 2011.  Also on January 31, 2011, Plaintiff, through his attorneys, appeared at an ex parte hearing with his application for a temporary restraining order, along with an order to show cause for a preliminary injunction.  The temporary restraining order was granted, with a hearing date on the preliminary injunction set for April 1, 2011.  The foreclosure sale was continued to April 11, 2011.

The case was removed to this Court on February 28, 2011.  Plaintiff, through his attorneys, requested Defendants to stipulate to extending the Temporary Restraining Order.   In response, Defendants agreed to postpone the foreclosure sale to May 20, 2011, in order to give Plaintiff an opportunity to bring this motion.

 Other significant facts are detailed in the text below, and in the declarations in support of the motion. FACTS

The verified sworn amended complaint herein establishes that Plaintiff Nader Shaterian is a Marin County, California homeowner with little expertise in mortgage lending, and was a first-time homeowner when he purchased his home in Mill Valley in 2003. That home – refinanced in August/September of 2007 – is now, due to the unfair, deceptive and unconscionable conduct of the Defendant WELLS FARGO, and its

predecessor-in-interest, and its agents including without limitation DIABLO, at imminent risk of foreclosure (Complaint, ¶9). In 2007, plaintiff sought re-financing for his home, to take advantage of lowering interest rates and to be able to withdraw a portion of the equity in his home to be able to finish needed improvements to his home.  After purchasing his home in 2003, he had learned that his home was slowly sliding down the hill on which it was built, and he needed to build two 14' by 100' retaining walls to save it at a cost of about $300,000. (Complaint, ¶10.) Plaintiff had protected his credit all his adult life, and in fact had a credit score of well over 700 at the time he contacted DIABLO. (Complaint, ¶11.) In August of 2007, DIABLO and WORLD "qualified" Mr. Shaterian for a new mortgage loan for the property, on what appeared to be very favorable terms (Complaint, ¶12). Aside from the fraudulent non-disclosure by DIABLO and WORLD to plaintiff of the exact nature of the terms of the WORLD loan and repayment thereof, there are problems inherent in the type of loan itself.  (Complaint, ¶12.) <u>Plaintiff was uncertain at the time he signed the closing documents – executed in blank – of exactly what type of loan he was getting</u>. (Complaint, ¶13.) As he discovered later, he had signed for a WORLD Pick-a-Payment ("PAP") mortgage loan.  PAP loans allow the Borrower to select and make a minimum payment amount for a limited time and subject to certain conditions.  In particular, for each payment the Borrower (here, Plaintiff) could choose from up to four (4) options: (1) a full-amortized 30 year interest and principal payment such that the loan would be satisfied in the traditional 30-year term; (2) a fully-amortized 15-year interest and principal payment such that the loan would be satisfied in a 15-year term; (3) an "interest-only payment"; or (4) a lesser, minimum payment.  When a payment was insufficient to pay the interest owed on the loan, unpaid interest was added to the loan's principal balance and the outstanding principal balance increased. (Complaint, ¶14.) Plaintiff's loan transaction with Defendants was a re-finance of an existing loan. Defendants provided disclosures that made it appear to Plaintiff that his PAP loan would provide him with savings and therefore was actually a better loan than the one he had.  That was precisely what Defendants intended with the PAP loan, as they designed them to lure unsuspecting Borrowers into loans with worse terms – by promoting their PAP loans purely based on a low payment, and the disclosures provided by Defendants hid and obscured the fact that the low payment actually was only a partial monthly payment, being subsidized by Borrower's equity. (Complaint, ¶15.) Plaintiff's Pick-A-Payment loan is what is known as a payment-option ARM (POA).  POAs were intentionally designed to result in negative amortization and obligations to pay compound interest. The POAs were also designed to make fully amortizing payments unaffordable to consumers, so that unsuspecting Borrowers would later have to seek a

modification of their loan to save their home, which then posed another problem for plaintiff like it has to so many Borrowers in similar circumstances: WELLS FARGO repeatedly requested documents already in their possession, lost documents and ultimately declined the modification. Plaintiff was given several different reasons for WELLS FARGO's several denial's of his modification requests, but one constant thing was clear:  WELLS FARGO had no intention of approving a modification of his WORLD loan, and the modification process was merely a ruse, intended to appear to satisfy the requirements of Civil Code  §2923.5.  (Complaint, ¶17.) POAs have been aggressively pressed on unsophisticated borrowers as a way to borrow more money with temporarily and artificially low monthly payments. Nearly $750 billion in these loans was issued between 2004 and 2007. POAs are characterized by and cause a substantial volume of defaults and foreclosures.  As of December 2008, 28% of option ARMs were delinquent or in foreclosure. (Complaint, ¶18.) In a POA loan, a borrower has, in theory, a choice of three payments: a minimum non-amortizing payment; an interest only payment that covers the actual interest accruing; and a fully amortizing payment. (Actually the choices are four, as the third is either a fully-amortized 15 or 30-year payment.)  In practice, because the loans are sold to Borrowers of limited means such as the Plaintiffs, (or limited in relation to a fully-amortized payment), three-quarters of all Borrowers pay only the minimum payment, thus generating negative amortization. Indeed, these Borrowers can often afford to make only the minimum monthly payment (if that), an amount that will never pay off the loan. Pick-a-payment loans are poisonous.  California's attorney general and U.S. District Court agree.  (Complaint, ¶ 19.)    Once POA principal caps are reached (typically at 110% to 125% of principal), the borrower must pay an amount sufficient to pay off the loan in the remaining time of the loan term. This means that if the original loan term was thirty years, and the remaining term is now twenty-five years, the aggregate principal plus accrued (unpaid) interest will be amortized over the remaining twenty-five years of the loan.  (Complaint, ¶ 20.)   The combination of negative amortization and forced payment restructuring including interest coming due on unpaid interest results in significant "payment shock," and significantly higher payment obligations thirty to sixty months after loan consummation.  (Complaint, ¶21.) POA loans are complex. They involve concepts that are unfamiliar and confusing to most, even fairly sophisticated, homeowners.  Consumers cannot calculate the increase in the payment in an adjustable rate mortgage.  The disclosures improperly minimize the interest rate risk by understating the increase in the payment.  (Complaint, ¶22.) Lenders, including WORLD, made these loans knowing that borrowers cannot afford the fully indexed rate or the anticipated fully amortizing payments.  (Complaint, ¶23.)  The adjustable rate note in this transaction has the following deceptive feature: a statement of the payments, when those

payments would lead to negative amortization, thereby triggering a complicated annual payment change regime that could only lead to substantial and unmanageable upward-only payment changes. (Complaint, ¶24.) Based on information in its possession, WORLD knew or should have known that the plaintiff could not afford payments that would amortize the loan and that the loan would ultimately either require further refinancing, forced sale of the property or default. (Complaint, ¶25.) The interest rate in the transaction is based on a margin and an index. The margin added to the "Current Index." Use of the term "Current Index" is deceptive. WORLD knew or should have known that the note language describing the Index would be impenetrable to its average customer. Moreover, it knew that Borrowers would not be able to obtain information to evaluate the index in order to compare a WORLD loan to other available loan products. Nor could customers, in light of the possibility of a change to an alternative index, rely on available information about the index. (Complaint, ¶26.) Thus, plaintiff was deprived of an opportunity to understand the consequences of a WORLD loan, could not comparison shop and could not evaluate the likely cost of future mortgage payments under the loan as designed. (Complaint, ¶27.) The note language was designed to obscure the actual rate that would be applied to the transaction so that typical borrowers, like Mr. Shaterian – a first-time homeowner - would be forced to focus on the temporary low payments set forth in the note – of $3,765.13. (Complaint, ¶28.) The note is deceptive and intended to and did deceive the plaintiff about the interest rate applicable to the transaction. (Complaint, ¶29.) In addition, the note is unfair in that WORLD retained discretion to change the Index to its advantage at any time. (Complaint, ¶30.) The note is also unfair in the circumstances because it binds the plaintiff to a loan structure he could not understand. (Complaint, ¶31.) And the note is deceptive and intended to deceive with respect to the amount of monthly payments. For example, the negative amortization loan allows for the original principal amount to increase to 125% of its original $985,000. That's a difference of $246,250 – and a resulting $19,700 per year or $1,641.67 in interest alone on just the additional principal amount! (And that's assuming 8% interest. After three years the note is an adjustable rate, with a maximum rate of 11.95%.) (Complaint, ¶32.) Eight states have now sued WELLS FARGO because the illegality of the "Pick-a-Payment" loans offered by Wachovia and Golden West Corp. (which did business as WORLD), and WELLS FARGO has entered into generous settlements, recognizing the harm done to Borrowers by Wachovia and WORLD – both of which are now owned by WELLS FARGO. (The settlement for California alone will provide nearly $2 billion worth of loan modifications to nearly 15,000 homeowners, and $32 million in damages to homeowners who lost their homes in foreclosure.) The eight states claimed that the lenders violated consumer

MOTION FOR PRELIMINARY INJUNCTION

protection laws because the loans exposed Borrowers to substantial economic risks that were not adequately disclosed.  Most Borrowers chose to make the minimum monthly payment, which did not cover the interest due and was partially funded by the Borrower's equity.  Once the amount due on the mortgage reached a certain percentage of the original loan (usually 110 percent of 125 percent) the Borrower loses the range of payment choices and must make fully amortized payments under the current – substantially higher – adjustable rate.  (Complaint, ¶33.)  The PAP loan sold to Plaintiff was intentionally designed to result in negative amortization and obligations to pay compound interest. The PAP was also designed to make fully amortizing payments unaffordable to Mr. Shaterian and to other consumers, and the payment had the potential to inflate to over $12,000 a month.  This was unknown to plaintiff when he signed for the loan.  Mr. Shaterian was therefore in the position of many other Borrowers - a slave to WELLS FARGO's unwillingness to permanently restructure (modify) his loan.  The refusal of WELLS FARGO to do so has caused plaintiff significant damage, and if the intended February 1, 2011 foreclosure is not stopped it will cause plaintiff irreparable harm.  (Complaint, ¶34.)  Thousands of California homeowners have PAP/POAs originated with WORLD and now owned by WELLS FARGO that will ultimately require payments that those homeowners cannot afford.  (Complaint, ¶34.) A U.S. District Court class action suit against WELLS for these PAP loans is currently nearing settlement in California: In re: Wachovia Corp. "Pick- a-Payment" Mortgage Marketing and Sales Practices Litigation, U.S. District Court, Northern District of California – San Jose Division; Case No. M:09-CV-2015-JF.   Plaintiff is automatically opted-in to the settlement class by his inclusion in the class of Borrowers it represents, unless he makes a decision for exclusion by March 16, 2011.  However, WELLS FARGO has refused to postpone the foreclosure and sale of plaintiff's home pending a final settlement in that action – and the hoped for relief for plaintiff, among others, through no less than an agreed modification of his loan, would be meaningless to plaintiff if he should lose his home in the interim. (Complaint, ¶35.)  DIABLO was the loan broker who promoted the PAP loan to plaintiff, and together with WORLD arranged the refinancing of the PROPERTY. Upon information and belief, there were numerous irregularities in the loan documentation and other aspects of the transaction. (Complaint, ¶36.)  During the loan application process, plaintiff was told by DIABLO, as an agent for WORLD, that he qualified for a favorable one-year 6% fixed-rate loan, and that after the one year period the loan would be an adjustable rate loan that would adjust downward to the then current interest rate.  In fact, he had signed for a PAP loan, with a three-year 8% fixed rate. (Complaint, ¶37.)  At the closing of the WORLD loan, plaintiff was given all of

the loan documents by DIABLO's agent, Juanita Garcia Apodaca, to sign in blank. Plaintiff was told that the reason for this was that negotiations were still underway with WORLD and that the documents would be completed by Apodaca. Plaintiff trusted DIABLO and WORLD, and Apodaca's representations, in signing the documents. (Complaint, ¶38.) Plaintiff relied upon the due diligence of the apparent "Lender" (DIABLO and WORLD) in executing and accepting the closing documents. In fact, no "lender" was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money in a residential loan closing. (Complaint, ¶39.) The WORLD loan documents are defective, fraudulent, predatory and unenforceable under the Truth in Lending Act ["TILA"]. (Complaint, ¶40.) At no time whatsoever did DIABLO or defendant WELLS FARGO ever advise plaintiff that: (a) the mortgage loan being processed was not in his best interest; (b) the terms of the mortgage loan being processed were less favorable than the fixed-rate loan which defendant previously advised plaintiff that he qualified for; (c) that the adjustable rate mortgage loan was an inter-temporal transaction (transaction where terms, risks, or provisions at the commencement of the transaction differ at a later time) on which plaintiff had only qualified at the initial "teaser" fixed rate but had not and could not qualify for the loan once the interest rate terms changed after year three; (d) that as a result of the change in interest rate after year three, that plaintiff would not be able to meet his financial obligation on the loan given his income and expense history previously provided to defendant; and (e) that plaintiff would likely be placed in a position of default, foreclosure, and deficiency judgment upon not being able to meet their increased loan obligations once the fixed rate interest period expired and the adjustable rate applied. (Complaint, ¶41.) As a result of the closing and in connection therewith, Defendant WELLS FARGO placed the plaintiff into a sub-prime adjustable rate mortgage program, intentionally misleading plaintiff and engaging in material omissions by failing to disclose to plaintiff the fact that the nature of the loan had been materially changed from how it was represented to plaintiff and that plaintiff was being placed into an adjustable rate mortgage program despite not being fully qualified for such a program. (Complaint, ¶42.) Further, prior to the closing, defendant failed to provide to plaintiff the preliminary disclosures required by the Truth-In-Lending Act pursuant to 12 CFR (also known as and referred to herein as "Regulation Z") sec. 226.17 and 18, and failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24 CFR sec. 3500.6 and 35007, otherwise known as the GFE. (Complaint, ¶43.) Defendant also intentionally failed and/or refused to provide plaintiff with various disclosures which would indicate to the plaintiff that the consumer credit contract entered into was void, illegal, and predatory in nature

due in part to the fact that Mr. Shaterian was not provided the proper disclosures of the actual contractually-due amounts and rates. (Complaint, ¶44.) Defendant WELLS FARGO, successor in interested to WORLD, the "Lender," was under numerous legal obligations as a fiduciary and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper, and that plaintiff received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after the closing. (Complaint, ¶45.) Plaintiff, not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon DIABLO and WORLD to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and Regulations. (Complaint, ¶46.) Defendant WELLS FARGO's violations were all material in nature under the Truth-In-Lending Act.  Said violations constitute violations of 15 USC sec. 1635(a) and (b) and 12 CFR sec. 226.23(b), and are thus a legal basis for and legally extend plaintiff's right to exercise the remedy of rescission. (Complaint, ¶47.) The original payee and holder of the promissory note was WORLD.  WORLD is apparently no longer in operation. Some or all of its assets may have been transferred to the Federal Deposit Insurance Corporation, Wachovia Mortgage, FSB, Wachovia Mortgage, and/or WELLS FARGO.  Plaintiff was not provided proper notice of any transfer of the promissory note, and alleges that neither WELLS FARGO nor CAL-WESTERN is the current holder of the promissory note, and that therefore neither WELLS FARGO nor CAL-WESTERN has standing to proceed with the foreclosure sale. (Complaint, ¶48.) On or about October 7, 2010 a Notice of Default was recorded.  However, in violation of Civil Code §2923.5, at no time prior to recordation of said notice, nor since then, and despite a pro-forma Declaration of a Ms. Sandra Garza (Vice President Loan Documentation – Wells Fargo Bank, N.A.) in which she alleges that WELLS FARGO has contacted the plaintiff as required in §2923.5(a)(2), has defendant WELLS FARGO worked with the Borrower in good faith towards obtaining a modification as required.  The "modification" attempt was a ruse; and WELLS FARGO failed to meet their burden under §2923.5(a)(2), Accordingly, the Notice of Default is void. (Complaint, ¶49.) Additionally, The Notice of Default recorded on October 7, 2010 shows CAL-WESTERN as trustee.  However, the Substitution of Trustees naming CAL-WESTERN as substitute trustee was not recorded until December 7, 2010, two months later.  Because CAL-WESTERN, (acting on behalf of Wells Fargo) had no authority to record the Notice of Default on October 7, 2010, it is a nullity.   Thus, the notice of default on record claims to be filed by a purported trustee who was not at that time a substituted trustee on the deed of trust. The substitution of trustee can not retroactively validate the earlier recordation. (Complaint, ¶50.) Furthermore,

the Notice of Default was signed by "Marco Marquez, LSI Title Company, as Agent." It is not clear who this individual was agent for, or under what authority he was acting. The Notice of Default did not contain an acknowledgment. (Complaint, ¶51.) CAL-WESTERN has thus recorded an improper Notice of Default, and the Notice of Default was recorded for a trustee who was not a trustee on the loan at the time. (Complaint, ¶52.) On January 12, 2011, CAL-WESTERN recorded a Notice of Trustee's Sale, with a sale date of February 1, 2011.

Plaintiff though the Bloomfield Law Office obtained a temporary restraining order against the foreclosure sale herein, in the Marin Superior Court. This order was obtained after notice to all defendants, an opportunity for them to be present and be heard, and an ex parte public hearing in open Court. (Bloomfield Declaration, ¶3.   The order obtained is part of the removal record.

The foreclosure sale at that time was scheduled for February 1, 2011, and the application was made the day before the scheduled sale.   Only because of the Court order was the sale postponed. Bloomfield declaration ¶5. Bloomfield advised the Marin Superior Court of his view that the Substitution of Trustee herein dated December 7, 2010 (Exhibit C to the accompanying Declaration of Nader Shaterian ("Shaterian Decl.") was not recorded early enough to justify the foreclosure sequence herein. The Notice of Default, Ex. A to the Shaterian Decl., was recorded on October 7, 2011, and shows Cal-Western Reconveyance as trustee.   However, the Substitution of Trustee naming Cal-Western Reconveyance as substitute trustee wasn't executed at that time, and they were thus not a proper agent at that time. Bloomfield declaration¶5.   The Substitution of Trustee was not executed until October 25, 2010 – per the notarization – but purports to be effective "as of September 22, 2010," and then was not recorded until December 7, 2010.   Bloomfield declaration ¶5.Since Cal-Western Reconveyance (acting on behalf of Wells Fargo Bank) had no authority to record the Notice of Default on October 7, 2010, it appears that it was a nullity. Nor is there any proper authority I am aware of for adding retroactivity to document signed October 25 but "as of" September 22.   The Notice of Default on record claims to be filed by a purported trustee who was not at that time a substituted trustee on the deed of trust. The Substitution of Trustee attempted to retroactively validate the earlier recordation. Wells Fargo Bank has thus Bloomfield's view recorded an improper Notice of Default, and the Notice of Default was recorded for and by a trustee who was not a trustee on the loan at the time. Bloomfield declaration ¶5-6. The late-recorded Substitution of Trustee itself seems defective on its face (Ex. C, Decl. of Shaterian). Cal-Western Reconveyance purports as agent for three lenders to appoint itself trustee to conduct the

foreclosure sale.  The beneficiary of the deed of trust, not the trustee purporting to act as agent for the beneficiary, should have been but was not the person making a Substitution of Trustee. Since Wells Fargo did not sign the substitution, nor did any of its predecessors in interest, and since Wells Fargo did not sign any recorded document authorizing Cal-Western to make itself agent for Wells Fargo to change trustees (a sequence that would seem odd in any case even if it did occur - why would Wells Fargo not itself sign a Substitution of Trustee, as it is the standard practice for the lender to sign, not the purported new trustee) it appears that the substitution would not be effective and thus Cal-Western would appear to not have authority to do what it purported to do.  Bloomfield declaration ¶6.

Because of the removal herein, it would have been necessary to promptly apply again for a new Temporary Restraining Order, so Bloomfield notified opposing counsel that he would do so unless opposing counsel  agreed to a stipulated order extension.  His notification and request for stipulation with attachments is attached to the Bloomfield declaration.In response, defendants voluntarily postponed the sale until a date sufficiently far out to get a hearing date for a motion for a preliminary injunction. Because of the sale postponement, the emergency that existed only required a notice hearing and not an emergency ex parte order. A copy of the reply to my request is attached to the Bloomfield declaration as Exhibit B. Bloomfield declaration ¶7-8. The Trustee's Sale is presently set for May 20, 2011. Unless defendants agree to postpone it until trial or agreement of the parties, a preliminary injunction would seem necessary to preserve the status quo herein. Bloomfield declaration ¶9.

The company purportedly holding the sale, which is defendant Cal- Western, was never appointed by or approved by Plaintiff. In fact, they seem to have appointed themselves. While World Savings may have had a right to change trustees, the present trustee change was done by the trustee themselves, purporting to be agent for World, Wachovia and Wells. Nothing is recorded authorizing this company to act which is actually signed by Wells, or Wachovia, or World, and thus they do not seem to be a proper trustee. But if allowed to act, they will cloud and take away title to Plaintiff's home. Shaterian Declaration ¶5. Plaintiff  could never qualify for the true payments at the true interest rate, so that he was put in a trap that he could not get out of by this loan.  he was "qualified' based on a misrepresented interest rate and "introductory" payments that were not his true payments and only covered a portion of what was actually due. Shaterian Declaration ¶6. Apparently two large California lawsuits have recently established that there are numerous victims like me, and procedures are just now being set up to rectify these wrongs.  However, I have not yet been offered these benefits, and some of them do not

take effect for another several months.  Two articles showing that then Attorney General Brown obtained $2 billion in benefits for people like me in new loans to replace the faulty ones are attached Exhibit D to the Shaterian declaration.  The second lawsuit is a pending class action settlement in which $50,000,000 is funded for one group of victims and other groups, like me, are to be offered new loans on a very complicated "waterfall" basis. Although Plaintiff has have been asking for a loan modification for years, no representative of defendants has offered him the settlement benefits yet from the Attorney General settlement, in which they come without a "string" of a prior release of defendants before one knows if they will provide a modification. Shaterian Declaration. Plaintiff is asking the Court to stay the threatened foreclosure sale until he gets a chance to demonstrate that he has suffered the same harm, and should recover the same benefits, including a new loan, that I can qualify for, either through the pending two settlements or otherwise by proving his damages in this case. Shaterian Declaration ¶ 5-7.  In 2007 when Plaintiff was looking for this loan, he contacted Diablo Funding Group ("Diablo") to re-finance his home. This was primarily in order to draw out equity so that he could finish needed improvements to my property, and pay for the improvements already in progress. Since purchasing the property four years earlier, he had discovered it was sliding down the hill, and he needed to build two 14' by 100' retaining walls, at a cost of about $300,000.  he had started the construction with my own funds, but needed the new loan to finish and to replenish his capital from the construction outlays. Shaterian Declaration ¶8.      Plaintiff worked with Juanita Apodaca from Diablo to get new financing.   Plaintiff She sold Plaintiff on a World Savings Bank, FSB, ("World") loan, and took care of all the documentation for the loan – working hand-in-hand with World. Shaterian Declaration ¶9 Plaintiff completed a Loan Application, and provided her copies of all his income and expense information including W-2's and tax returns.

Ms. Apodaca represented to Plaintiff that the loan he was applying for was a one-year fixed rate – of approximately 6% - but that after the first year it would become adjustable, and could adjust downward to the then-current interest rate.  This was very attractive to him, and sold him on the loan. Plaintiff knew that the first year might be a stretch, at 6%, but interest rates were going down and he anticipated his payment descending over time.  However, his payments did not go down, they went up, and his interest rate was not 6% as represented. He was deceived. Shaterian Declaration ¶10. When it was time to sign the closing documents, they were presented to Plaintiff with significant items blank. His ex-wife had to sign certain documents as well and her documents had significant blanks as well.

Ms. Apodaca told Plaintiff that  she was still working out the details with World, and continued to represent to him the favorable loans terms of a one-year fixed loan at around 6% interest.  Shaterian Declaration ¶11  Many of the loan documents had to be notarized.  Plaintiff discovered later that they were notarized "after-the-fact" by a Yolando Apodaca, who must have been a relative of Juanita. Shaterian Declaration ¶12.  Misrepresenting the true terms of the loan, and concealing the truth from Plaintiff by having him sign the documents in blank were not the only frauds that Diablo's agent, Ms. Apodaca, committed.  After the closing Plaintiff obtained a copy of the Final Settlement Statement which showed a $16,136.22 payment through escrow to a J Construction for apparent "home improvements."  The invoice was a fraud, created by Ms. Apodaca to divert money to herself or a friend or relative, and there was never any such work done. I was not the only who was victimized by Ms. Apodaca, and on information and belief it is my understanding that Ms. Apodaca was later convicted of a crime for certain frauds related to her "loan dealings." Shaterian Declaration ¶13Diablo and Ms. Apodaca were in cahoots with World, who was busy selling negative amortization loans to naïve homeowners like myself.  Plaintiff  was not familiar with these types of loans then, but has now sadly come to learn a lot about them. Shaterian Declaration ¶14. .   Plaintiff learned after the fact that he had signed up for an 8% interest rate loan – but still thought that it was a one-year fixed.  After the year was up, He contacted Wachovia (who then owned World), and asked about adjusting my interest rate downward – as it was considerably higher than the then current rates.  He then learned  that his loan was a three-year fixed, not a one-year.  The nature of the loan had never been properly explained to him. Shaterian Declaration ¶15.  Plaintiff also learned later that my loan was a negative amortization loan – and what is known as a "Pick-A-Payment" loan – and what that means: that the low loan payments I was offered for the first three years didn't even cover interest and that his principal amount was increasing every month. Shaterian Declaration ¶16.  Plaintiff has tried many times to adjust his interest rate with Wachovia (now owned by Wells Fargo), but have never had any success because he could never qualify for the excessively higher payments - this was the fraud that was perpetrated on him. He  was made a loan he could not qualify for, when it was made, and then when rates when down, denied modification because he could not qualify for the loan.  Only with the fake gimmick of using the low teaser rate could he qualify. Shaterian Declaration ¶17        In June of 2010 Plaintiff contacted Wells Fargo directly   through a local bank agent – John Kearney, a Wells Fargo Bank "Loan Adjustment Specialist," seeking a loan modification.  Mr. Kearney submitted a loan modification

application to Wachovia, but Plaintiff never heard back from Wells or Wachovia.  Mr. Kearney later told Plaintiff that he had to contact Wachovia directly, on his own, and gave him an (800) number.  It was the same number he had called previously seeking a rate adjustment and was denied. Shaterian Declaration ¶18   Plaintiff dealt directly with Wachovia then, meeting with a Wachovia agent in August/September of 2010.  He faxed in an application, which was denied in October of 2010.  He believes that the denial was in bad faith, and that under the criteria represented to him he should have qualified for a modification of his loan. Shaterian Declaration ¶19 Plaintiff I submitted a second application in November of 2010, and it was denied in December.  Again, the denial was unwarranted. Shaterian Declaration ¶20. 21. Wells Fargo Bank states in a declaration they attached to the Notice of Default they recorded against my property, in March of 2010, that they "contacted the borrower"  as required by law to offer him alternatives to foreclosure.  This is untrue. Plaintiffs first contact with Wells was in June, of 2010 when he contacted them.  And that contact did not contain the statutory items they were obligated to disclose to him. Wells Fargo had not taken over the loan back when Wells claims to have notified Plaintiff and spoken to Plaintiff. Shaterian Declaration ¶21 Plaintiff thinks that Wells Fargo (and Wachovia) never had any intention of granting him a modification.  He was denied an interest rate adjustment several times, and a loan modification twice, and both times for different reasons: he didn't make enough money, he had too much debt, etc. But neither of these modifications was processed in the special way (borrower finally recognizing the "Pick a Payment" wrongs) that will be available now under the Attorney General Settlement and the Class Action settlement, and should be easy for Wells to now apply to his situation and produce a different result.  Additionally, Plaintiffls income has recently improved somewhat, so it is now possible that he would qualify under any standard, and especially the enhanced borrower friendly standards of the Attorney General "Assurance"-- if Wells Fargo does not take my home from me before I have time to do so. Shaterian Declaration ¶22.       The California Attorney General and some class action attorneys have brought Wells Fargo partially to justice, but the justice has not yet trickled down to Plaintiff. No one has evaluated Plaintiff under the two settlements for a loan modification. That process now needs to start, and it has not yet had a chance to start. The California Attorney General settlement only occurred in late December 2010. The press release indicates $2 billion dollars in new loans will be made to persons like Plaintiff but the promised mail notices have never come to Plaintiff.   Plaintiff does not yet have a

notification of it from the Attorney General, and thus have not yet had a loan modification process started with the special features under that settlement. Shaterian Declaration ¶23

The class action case, M:09CV-2015 in the Northern District of California, is also relevant and Plaintiff is asking the Court to take judicial notice of it. That settlement does not protect people like Plaintiff who have a threatened sale, it only gives them possibly some minimal compensation after the fact. For that reason primarily, and for several other reasons, he has opted out of the settlement, although the administrator of the settlement may be contesting my opt out, so the status is not 100% clear. That settlement provides a good guideline for how Wells Fargo can, should, and hopefully will apply a loan modification for him, which could be a good basis with some additional provisions and injunctive relief until it is completed, for a settlement of his claim and lawsuit. The special set of "settlement" representatives to apply the special benefit standards of that settlement will already be in place and he believes that they could be easily used to facilitate settlement of this case. However, if the sale is allowed to occur on May 20th when Wells has scheduled it and threatens to hold it, thenI will not be eligible for the home saving features of loan modification plans which he believes that he is am eligible for under both settlements, or either, nor from the equivalent which he believes he should be able to attain as equitable relief in this lawsuit, since his home will, but for injunctive relief, soon no longer belong to him. He love this home and it is of unique value to him. Shaterian Declaration ¶24

Oneor more parties have objected to the Class Action settlement and pointed out that although it is long and wordy, it is not easy to find where persons who are about to be foreclosed against get any help or assistance at all in not going over the cliff while the settlement is pending. Because of that objection, settlement approval in the Class Action may be postponed, and it is likely there will be or may be a new opt in/opt out option emanating from how the settlement is revised to suit the objection. It is and remains my preference to resolve my differences directly with the defendants and to get my relief and my damages in State Court, but it is possible that developments in the Class Action could cause that choice to be re-determined at some later time. Shaterian Declaration ¶25. The World loan was not only a financial hardship on me for years while Plaintiff was paying it, but his dealings with Wells Fargo and Wachovia in the past couple of years have caused him great emotional distress. The damage has been significant to his credit, which is now ruined, and he has thus lost the option of "other financing" to save my home. Shaterian Declaration ¶26 It is Plaintiff's belief that the loan I was sold was designed to fail – and it did. Or at the least – it was designed to make money for the

lender – which it did – without regard to the victim borrower. Shaterian Declaration ¶27. It also seems evident to Plaintiff that Wells Fargo is trying to conclude the foreclosure of my property prior to the finalization of either the class action settlement or the State Attorney General action of April 2011 that he might qualify for if I still own my home then.  By allowing Wells Fargo to go forward with the sale, Plaintiff would be effectively cut out of the potential to obtain relief for what seems to him, to the Class action Plaintiffs in the "Pick a Payment" case, and to the California State Attorney General to be a proper grievance in need to being redressed and addressed.  Plaintiff wants the benefits of the California Attorney general Assurance, a copy of which is attached to his declaration and also to the request for judicial notice herein,  but they have never been offered to Plaintiff. Wells has not to this date told Plaintiff, as they promised the California Attorney General that they would, that they are willing to process an application for Plaintiff under the new standards they have evolved. Plaintiff believes that he may qualify under the new standards with principal reductions.  Shaterian Declaration ¶28

Plaintiff understands that Wells Fargo is settling or has settled with homeowners like myself in class actions and Attorney General actions in at least nine states, including California. At paragraph II E, recognizing the depth of the wrong that has been done to California consumers by World and Wachovia, and Wells obligations on taking these items over, Wells signed with California's Attorney General an Assurance that Plaintiff, and other victims like him, would be offered certain benefits.  At page 2, paragraph II e of that Assurance, it says that Wells will offer to Plaintiff and those like him an affordable loan modification that will include principal forgiveness. This has not yet occurred. It also says at page 13 paragraph VI that Wells will send to Plaintiff two letters telling me how to proceed to get my loan modification. He has never received these letters.  (In fact, in his first communication with "Wells" was the June 2010 loan modification attempt in which I was referred to Wachovia – with Wells telling me there was nothing they could (or would) do for me.  Shaterian Declaration ¶29. Plaintiff wishes  to have such a modification, but have not yet been able to start the process under these new and hopeful settlement guidelines.  As he understand it, the California Attorney General settlement does not require him to participate in the Class Action settlement.  There are significant problems with the Class Action settlement. The California Attorney general settlement does not require him to release any claims.  Plaintiff believes that this framework is a good one to maximize the chance this matter can be settled on a basis that works for him and for Wells Fargo. However, if Wells Fargo is permitted to

roll over him, a simple consumer, with their huge in-place steamroller machinery, and foreclose him out, he will have suffered irreparable harm and there will be no way to fix it. Shaterian Declaration ¶30 As soon as Plaintiff receives the State Attorney General settlement letter, which he have not yet received (He had to research this web site himself) he has offered to start the process of seeing if Wells Fargo will do for him what they promised the California attorney General that they would do in the Assurance document attached.     He believes that if the sale is postponed while he is I pursuing his action against Wells Fargo, that he will prevail like other "Pick-A-Payment" loan plaintiffs and with the help of the California Attorney General program, will get a principal reduction and a much fairer loan. If not, then he expects at trial that he will be awarded sufficiently large damages that defendants will in effect fund his claim for recession and/or lower the balance enough that he can obtain an affordable loan to repay the then reduced balance, and thus he will  be able to keep my home. He is asking that this court allow him that opportunity. He is gainfully employed, has reasonable income, and but for the predatory practices complained of by the State Attorney General and which the State Attorney General concluded violated portions of California Business and Professions Code sections 17200 and 17500 (see paragraph B of the stipulation, Exhibit E) he would not need this Courts help with injunctive relief. But because of those violations and the others set forth in his complaint, he <u>does</u> need the Courts help to avoid being crushed before he has time to get his loan modification and until I get time to prove my offsetting damages against the loan balance. Shaterian Declaration ¶31

If the present foreclosure sale in this case allowed to go forward, there will be irreparable harm to Plaintiff, and he will lose the opportunity to pursue his case in this action for equitable relief and to prevent the wrongful scheduled foreclosure, and also lose the benefits he might get as part of the settlement in the recent Attorney General settlement, and lose a path to benefits equivalent to those in the pending "Pick and Pay" Class action settlement. Shaterian Declaration ¶33    If Wells and Plaintiff do not agree to an enhanced modification after a streamlined modification review under the Attorney General program, which they have not yet offered to Plaintiff, then he want to rescind the loan and get back all the interest Plaintiffs have wrongfully taken.  He expects that his rescission damages may equal the loan amount and he may be entitled to the house free and clear. I would rather take the middle ground of a fair loan modification and principal reduction, as promised under the Attorney General program that does not require hime to release Wells as a precondition of seeing if they will do the

enhanced modification. Shaterian Declaration ¶34 . Plaintiff now seeks a preliminary injunction, to maintain the status quo ante until the conclusion of this case.

## Legal Argument

**1. The Court Has Authority to Issue a Preliminary Injunction. Plaintiff Has Met the Requirements for the Issuance of a Preliminary Injunction Outlined by the Supreme Court and by the Ninth Circuit. The Court Should Issue a Preliminary Injunction.**

Federal Rules of Civil Procedure, Rule 65, provides that the Court may issue a preliminary injunction on notice to the adverse party. Here, upon the filing of this motion, the adverse parties were notified through the ECF system.

The purpose of a preliminary injunction is to preserve the status quo ante as it existed prior to litigation until the action can be determined on its merits. (*Sierra Forest Legacy v. Rey* (9th Cir. 2009) 577 F. 3d 1015, 1023.)

In order to qualify for a preliminary injunction, Plaintiff must meet a four-part test: "A Plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. [Citations.]" (*Winter v. Natural Resources Defense Council, Inc.* (2008) 555 U.S. 7, 129 S. Ct. 365, 374.)

The Ninth Circuit uses a "sliding scale" approach to preliminary injunction.

> Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to Plaintiff may offset a lesser showing of likelihood of success on the merits. [Citation.] This circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that "serious questions going to the merits have been raised, and the balance of hardships tips sharply in [Plaintiff's] favor." [Citation.]

(*Alliance for the Wild Rockies v. Cottrell* (9th Cir.2011) 632 F. 3rd 1127, 2011 U.S. App. Lexis 1473, pp. 10-11.)

The Trustee's Sale of Plaintiff's property threatens imminent irreparable harm. (See, *Sundance Land Corp. vs. Cmty. First Fed. Sav & Loan Ass'n*, 840 F.2d 653, 661-62 (9th Cir. 1988) (foreclosure on

18

real property constitutes irreparable harm).  The property at issue is Plaintiff's home, and it would be irrevocably lost if the sale of the property is allowed to occur.

As further discussed below, with this motion, Plaintiff has made a strong showing of irreparable harm.  He has also shown that serious questions going to the merits have been raised, that the equities tip in his favor, and that an injunction is in the public interest.  For these reasons, the Court should issue the preliminary injunction requested by Plaintiff.

## 2.  The Loss of a Personal Residence is Constitutes Irreparable Harm

The threat to Plaintiff if the preliminary injunction is denied is that Defendants will proceed with the foreclosure of Plaintiff's residence.  "It is well-established that the loss of an interest in real property constitutes and irreparable injury.   [Citation.]"   (*Park Village Apartment Tenant's Association v. Mortimer Howard Trust* (9th Cir. 2011) 2011 U.S. App. Lexis 3683, pp. 4-5).

Threatened foreclosure of real property gives rise to immediate, irreparable injury.  (*Sundance Land Corp. v. Community First Federal. Savings & Loan Association* (9th Cir. 1988) 840 F. 2d 653, 661.)  "The loss of one's home through foreclosure generally is considered sufficient to establish irreparable harm. [Citation.]"  (*Saba v. Caplan*. (N.D.. Cal. 2010) 2010 U.S. Dist. Lexis 76790, p. 13.)

"Property is considered unique, and therefore the court finds that Plaintiffs' remedy at law, damages, would be inadequate.   It is also clear that if Defendants foreclosed on the property, Plaintiffs' injury would be irreparable because they might not be able to reacquire it. [Citation.]  This fact weighs heavily in favor of Plaintiffs."  (*Sharma v. Provident Funding Association* (N.D. Cal. 2010) 2010 U.S. Dist. Lexis 1407, pp. 3-4.)

The Trustee's Sale of Plaintiff's residence is presently set for May 20, 2011.  If the preliminary injunction is not granted, Plaintiff will lose his home.  He has made a strong showing of irreparable harm.

MOTION FOR PRELIMINARY INJUNCTION

**3.  Defendants Failed to Comply with California Civil Code Section 2923.5.  This Is Grounds for Enjoining the Trustee's Sale.**

In California, a nonjudicial foreclosure sale is a statutory creation.  "It has long been beyond dispute that strict compliance with the provisions of California's foreclosure statutes is essential to a valid nonjudicial foreclosure on California real property. [Citation.]"  (*In re Houghton* (C.D. Cal. Bankr. 1991) 123 B.R. 869, 875.)  ". . . [T]he foreclosure procedure, being statutorily prescribed, must be strictly complied with.  [Citation.]"  (*Whitman v. Transtate Title Co*. (C.A. Cal. 1985) 165 Cal. App. 3d 312, 322.)  "Because nonjudicial foreclosure is a 'drastic sanction' and a 'draconian remedy' [citation] 'the statutory requirements must be strictly complied with and a trustee's sale based on statutorily deficient notice of default is invalid.' [Citations]"  (*Ung v. Koehler* (C.A. Cal. 2005 ) 135 Cal. App. 4th 186, 202-3.)

Here, Plaintiff contends that the Notice of Default is invalid because Defendants failed to comply with California Civil Code section 2923.5.  This statute requires "a mortgagee, trustee, beneficiary, or authorized agent" to contact the borrower in person or by telephone and explore options for the borrower to avoid foreclosure.  Although a declaration dated March 13, 2010 was attached to the Notice of Default declaring that Wells Fargo contacted the borrower as set forth in California Civil Code section 2923.5, Plaintiff denies that he was contacted in person or by telephone by Wells Fargo prior to March 13, 2010 to discuss alternatives to foreclosure.  (See Declaration of Nader Shaterian, filed herewith.)  This raises a serious question going to the merits.  (See, *Sharma v. Provident Funding Association* (N.D. Cal. 2010) 2010 U.S. Dist. Lexis 1407, pp. 4-6, *Dumas v. First Northern Bank* (E.D. Cal 2011) 2011 U.S. Dist. Lexis 16775, pp. 3-4.)

The remedy provided by California Civil Code section 2923.5 is postponement of the foreclosure sale.  This remedy is not preempted by federal law, and the borrower is not required to tender the amount of the indebtedness to be entitled to his or her rights under this section.  (*Mabry v. Superior Court* (C.A. Cal 2010) 185 Cal. App. 4th 208, 213-4; *Keng Hee Paik v. Wells Fargo Bank*, N.A. (N.D. Cal. 2011) 2011 U.S. Dist. Lexis 3979, pp. 7-8.)

1   As discussed below, there are additional reasons for granting the preliminary injunction, but

2   Defendants' violation of California Civil Code section 2923.5 in and of itself satisfies the

3   requirement that Plaintiff show that serious questions going to the merits have been raised.

4   **4.   The Notice of Default Was Issued By an Entity That Had No Authority to Issue the Notice.**
    **This Is Separate Grounds for Enjoining the Trustee's Sale.**

5   The Notice of Default is void because Cal-Western was not substituted in as trustee until

6   months after the Notice of Default was recorded.  Pursuant to Civil Code section 2924(a)(1), the

7   Notice of Default may be recorded by the trustee, mortgagee, beneficiary, or any of their authorized

8   agents.  When the Notice of Default was recorded on October 7, 2010 by Cal-Western, it could not

9   have been acting as trustee or substituted trustee, because it was not substituted in as trustee until the

10  Substitution of Trustee was recorded on December 7, 2010.  The Notice of Default states that Cal-

11  Western "is either the original trustee, the duly appointed substitute trustee, or acting as agent for the

12  trustee or beneficiary . . ."  Cal-Western was not the original trustee, because, as reflected in the Deed

13  of Trust, Golden West Savings Association was the original trustee.  Since Cal-Western was not the

14  original trustee, for it to allege that it *could have been* the original trustee is patently false.  Because of

15  this false statement, the Court should look with suspicion upon Cal-Western's allegations.

16  Furthermore, Cal-Western has not established that it was acting as the agent for the trustee or

17  beneficiary.  To establish that it was acting as the agent for the trustee or beneficiary, Cal-Western

18  would have to produce a document showing the agency relationship.  This document would need to

19  have been created prior to the date of the Notice of Default by its principal, which would be either

20  Golden West Savings Association or Wells Fargo.  "[A]n agency cannot be created by the conduct of

21  the agent alone; rather, conduct by the principal is essential to create the agency."  (*Flores v.*

22  *Evergreen at San Diego, LLC* (C.A. Cal. 2007) 148 Cal. App. 4th 581, 587-8.) There is no document

23  from Wells Fargo or Golden West allowing Cal-Western to act as trustee.  An agency can only be

24  created by the principal, not by the purported agent.

25  Since Cal-Western had no authority to act when the Notice of Default was recorded, the Notice

26  of Default is void, and the foreclosure sale cannot legally proceed until a new and valid Notice of

27  Default is recorded.  Cal-Western did not become substitute trustee until the Substitution of Trustee

28

---

MOTION FOR PRELIMINARY INJUNCTION

was recorded on December 7, 2010.  Although Cal-Western could record a new Notice of Default, the foreclosure sale cannot proceed based on the Notice of Default recorded on October 7, 2010.

The substitution of trustees purporting to make Defendant Cal-Western the trustee to hold this sale is also improper in that it was signed by the trustee but not by the beneficiary, and is or should be void or voidable. Plaintiff is a victim of a loan scam, and wants his chance to proof at trial that his loan is void or voidable.  Plaintiff will suffer irreparable harm before he can get to do any of the above, and before he can prove the purported foreclosing trustee has no proper standing on his loan, unless he is granted a temporary restraining order.

The invalidity of the Notice of Default also satisfies the requirement that Plaintiff show that serious questions going to the merits have been raised.

**5.  The Balance of Hardships Favors Plaintiff.**

In weighing the hardships to Plaintiff and Defendant, equity favors Plaintiff.  If the preliminary injunction is denied, Plaintiff will lose his home to foreclosure.     If the preliminary injunction is granted, Defendant will have to delay the foreclosure sale until the conclusion of this case. Defendant's interest is secured by the residence.   "[P]ostponing the foreclosure until Defendant complies with § 2923.5 is not an undue hardship, especially when compared with Plaintiff's risk of losing his home in a foreclosure sale."  (*Dumas v. First Northern Bank* (E.D. Cal 2011) 2011 U.S. Dist. Lexis 16775, pp. 5-6.)

> Plaintiff has also shown the balance of hardships tips sharply towards him. If the TRO is not issued, Plaintiff is likely to lose possession of his home through a judicial foreclosure sale. In contrast, if the TRO is issued, Defendants will merely be required to delay the foreclosure sale. Their interest in Plaintiff's property will remain secured and, should this Order be dissolved or judgment be entered in favor of Defendants in this action, they will be able to proceed with the foreclosure sale at such time.

(*Cruz v. Washington Mutual Bank* (S.D. Cal. 2011) 2011 U.S. Dist. Lexis 25439, p. 7.)

Clearly the balance of equities favors Plaintiff.  Since he has met the requirements for the issuance of a preliminary injunction (as discussed above and below), the motion for preliminary injunction should be granted.

**6.  Public Interest Favors Granting the Preliminary Injunction.**

The foreclosure statutes protect both lenders and borrowers.  Compliance with these statutes is in the public interest.  "It is in the public interest to require lenders to comply with the California statutes enacted to protect homeowners from unnecessary foreclosures. The court finds, therefore, that the public interest weighs in favor of granting Plaintiff's preliminary injunction." (*Dumas v. First Northern Bank* (E.D. Cal 2011) 2011 U.S. Dist. Lexis 16775, p. 6.)  "Given the current widespread financial crises, skyrocketing unemployment, and the attendant plummet in home values, the public interest favors keeping them in their homes while the instant lawsuit proceeds . . ."[1]  (*Rivera v. BAC Home Loan Servicing, L.P.* (N.D. Cal. 2010) 2010 U.S. Dist. Lexis 60668, p. 5.)

Plaintiff has satisfied the requirement of showing that the issuance of a preliminary injunction is in the public interest.  Since he has satisfied all of the requirements for the issuance of a preliminary injunction, his motion should be granted.

**7.  There Are Additional Important Reasons to Grant the Injunction.**

Plaintiff will suffer irreparable injury if Defendants are not enjoined from selling his home, in that he will lose his property; furthermore, Plaintiff's **First-Amended Complaint** filed herein states numerous grounds for rescission of the alleged deed of trust and/or note, including fraud, lack of standing, and failure to comply with statutory requisites for conducting such a sale.

The requested injunction is necessary to maintain the status quo ante, and to preserve Plaintiff's property – the home at 511 Browning Court, Mill Valley, California.

<u>**First-Amended Complaint on File In This Action**</u>

Based upon the foregoing and other wrongful conduct, Plaintiff has a filed a First-Amended Complaint seeking injunctive relief and damages against Defendants alleging the following causes of action: (1) Fraud and Deceit; (2) To Void Contract Based on Unconscionable aspects of the loan; (3) Contractual Breach of Implied Covenant of Good Faith and Fair Dealing; (4) Violation of Civil Code § 1916.7; (5) Violation of Civil Code §§ 1920 AND 1921; (6) Violations of Federal Truth-in-Lending Act; (7) Breach of Fiduciary Duty; (8) Unfair Business Practices; (9) Rescission; (10) Injunctive Relief; and (11) Declaratory Relief.  Plaintiff has also referred to the State Attorney General proceedings and the unfair nature of the loan, which by Federal pleading standards brings up the

---

[1] This decision related to a Temporary Restraining Order, of limited duration (14 days).

unfair business practices referred to in the California State Attorney General's "Assurance" agreement with Wells Fargo.

### "Pick-a-Payment" Loans Harmful to Borrower

The loan complained of is a "Pick-a-Payment" loan that has been determined by Attorney General (now Governor) Edmund G. Brown, Jr. in December 2010 to be improper and harmful to borrowers. He made a settlement, involving replacement mortgages for the victims, in an amount the Office of the Attorney General announced as $2 billion, but that settlement is not yet in place. Another settlement in a class action case on the same improper loans has $75,000,000 in funding and a waterfall system of loan benefits for persons like Plaintiff. That settlement will come up before the United States District Court in late May and is not yet approved. Plaintiff needs the same benefits, in this lawsuit or from one or both of these settlements. The benefits for those who lost their homes in both settlements are trivial; the benefits of a "rescuing" revived modified loan are not trivial. Plaintiff is trying to avoid having the larger damage claim that will come from a lost home, plus his rescission claim will become moot if the home passes on to ownership of others. For all these reasons, and the others referred to above and below herein, injunctive relief is appropriate.

### Unfair Business Practices by Wells Predecessors in Interest

The First Amended Complaint sets forth numerous grounds to rescind as well as bases to enjoin the Trustee's Sale, including fraud by the lender and other improprieties with failure to provide proper statutory notices by the lenders and for various statutory violations in connection with the loan.

The First-Amended Complaint also describes in detail the type of loan that Plaintiff was lured into getting, a "Pick-a-Payment" loan that is currently the subject of litigation in eight states, including California.

The California Attorney General has made a claim against Wells for violating California Unfair Business Practices Act. The Attorney General alleged violations of California Business and Professions Code sections   and 17200 and 17500. A settlement has been reached in which Wells has promised to make amends by giving notices to borrowers and giving them opportunity for loan modifications with special enhanced review and special options. Plaintiff here has never received the notice promised by that Settlement called an "Assurance". Plaintiff has never been processed for the benefits under the Assurance. If the foreclosure is allowed to proceed, he will not have his home

MOTION FOR PRELIMINARY INJUNCTION

anymore and not be able to available himself of these benefits that he believes he is entitled to and he believes he can qualify for based on his current income.  The timing of the looming sale virtually guarantees that Plaintiff cannot avail himself of the options Wells is ostensibly offering to thousands of similarly-situated borrowers as part of a settlement with the Attorney General of California.

A U.S. District Court class action suit against Wells for these "Pick-a-Payment" loans is currently nearing settlement in California: *In re: Wachovia Corp. "Pick- a-Payment" Mortgage Marketing and Sales Practices Litigation*, U.S. District Court, Northern District of California – San Jose Division; Case No. M:09-CV-2015-JF.   That settlement requires a release of claims to participate - first the consumer releases his claims, then he learns if he will get a loan modification.

The California Attorney General settlement makes no such requirements. Plaintiff wishes to get the benefits of the California Attorney General settlement.  The Assurance is included in the moving papers and in the request for judicial notice. The hoped-for relief for Plaintiff in the Attorney General proceedings, through an agreed modification of his loan, would be meaningless to Plaintiff if he should lose his home prior to this program being implemented.

Though Wells Fargo (as successor to World Savings Bank and Wachovia) denies the claims against it, and denies its lending practices violated any laws or that it harmed any customers, it nonetheless entered into a settlement in December with the California Attorney General as well as the above-referenced class action settlement which Attorney General Brown said involved $2 billion in new loans.   Counsel argues that those settlements, as well as settlements by Wells Fargo with the Attorney Generals of eight other states, totaling billions of dollars in relief to "Pick-A-Payment" loan holders, is an implied admission on the part of Wells Fargo to the enormous harm done to homeowners by World Savings and Wachovia. Wells expressly joins with Attorney General Brown in stipulating that this type of loan can cause harm to the borrower in the December 2010 Assurance.

Defendant has also agreed to fund $75 million dollars to pay certain similar victims some damages, in a class action case in a tentative settlement not yet approved, coming for hearing on March 16, 2011.  This settlement has special procedures to qualify borrowers in a cascading waterfall system, under which Plaintiff may qualify for a principal reduction, and/or interest and penalty forgiveness, and a fair replacement loan.

The loan to Plaintiff was and is a classic predatory loan. Plaintiff deserves the opportunity to present his claim for relief and preserve his home.  Plaintiff prefers to litigate in state Court and have the

benefit of the State unfair business practices protections.  He may have to litigate here, depending on his motion to remand and his opposition soon to be filed to Defendants motions to dismiss. But even in that event, the court should and will be able to fashion the same or similar relief for Plaintiff. However, if the sale has already occurred, this would most likely be impossible.

### Notice to Rescind

Because of the failures to disclose, and lending fraud, Plaintiff's time to rescind has been extended until the present. Pursuant to Civil Code §1691, by service of the First-Amended Complaint, Plaintiff has served a proper and timely Notice of Rescission on each of the lender Defendants herein, citing as a basis the Defendants' fraudulent and illegal conduct cited herein.

There is no prejudice to Defendants from an injunction because if Defendants have an enforceable security interest in the Property contrary to Plaintiff's interest, they will have the opportunity to foreclose after the trial.

Because the underlying property is secured, Defendants' interests in the property are protected, and therefore no undertaking should be required.

### CONCLUSION

The Court should grant Plaintiff's motion for a preliminary injunction.  The Court has the authority to do so, and this will maintain the status quo ante until the completion of this case. Plaintiff has satisfied the four requirements for the issuance of a preliminary injunction:  He has shown that serious questions going to the merits have been raised.  He has shown a strong showing that he will suffer irreparable harm if the preliminary injunction is denied.  He has shown that the equities balance in his favor, and he has shown that granting the preliminary injunction will be in the public interest.

This motion for preliminary injunction will be heard concurrently with Defendant's Motion to Dismiss and with Plaintiff's Motion to Remand.  If the Court grants the Motion to Remand, or if it grants the Motion to Dismiss with leave to amend, it should also grant a short-term preliminary injunction or temporary restraining order to maintain the status quo pending either remand or amendment of the complaint.  If the case proceeds in District Court, the preliminary injunction should be granted for all of the reasons discussed above.

Dated:  April 8, 2011                          BLOOMFIELD LAW GROUP, INC.

A Professional Corporation

By: /s/ Neil Jon Bloomfield_____

      Neil Jon Bloomfield

      Attorney for Plaintiff

      Nader Shaterian

MOTION FOR PRELIMINARY INJUNCTION

### CERTIFICATE OF SERVICE

I, the undersigned, declare that I am over the age of eighteen years and am not a party to the within-entitled action; my business address is 901 E Street, Suite 100, San Rafael, CA 94901.

On the date below, the attached document(s) entitled:

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION TO RESTRAIN TRUSTEE'S SALE OF PLAINTIFF'S RESIDENCE**

was served on all interested parties in said matter addressed as follows:

| | |
|---|---|
| Robin Prema Wright, Esq. | Christopher A. Carr |
| Nicole K. Neff, Esq. | Viddell Lee Heard |
| WRIGHT, FINLAY & ZAK, LLP | ANGLIN, FLEWELLING, RASMUSSEN, |
| 4665 MacArthur Court, Suite 280 | CAMPBELL & TRYTTEN LLP |
| Newport Beach, CA 92660 | 199 S. Los Robles Ave., Suite 600 |
| | Pasadena, CA 91101-2459 |

☑ **(BY MAIL)** by placing a true copy thereof enclosed in a sealed envelope or package, addressed to the party(ies) as stated above or on the attached service list. I am readily familiar with the firm's business practice for collection and processing of envelopes and packages for mailing with the U.S. Postal Service. Under the firm's practice, mail is deposited in the ordinary course of business with the United States Postal Service at San Rafael, California, that same day, with postage thereon fully prepaid. I am aware that upon motion of the party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after the date of deposit for mailing.

☑ **(Federal)** I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 8, 2011

_/s/ Susan Cofano_____.
Susan Cofano
Legal Assistant

28

MOTION FOR PRELIMINARY INJUNCTION